## Michael McLaughlin v. J. & T. Green.

1. MECHANIC'S LIEN AND MORTGAGE CREDITORS—PRIORITIES.—Under the mechanic's lien law of 1840 (Hutch. Code, 627, 628), a mechanic or material man has a lien for his labor or materials prior to all others, on the buildings to the erection of which his labor or materials have been contributed; and, if the buildings have been destroyed by fire, his lien adheres to whatever brick, iron, or other debris may remain.

2. SAME.—An older mortgage or other ordinary creditor's lien on the land, even with notice, cannot preclude the mechanic's or material man's lien on the building.

3. SAME—NOTICE.—The mechanic's lien commences from the time of his contract to do the work, and postpones all subsequent liens, or prior liens without notice on the land, and all liens whatever on the building.

4. APPROPRIATION OF PAYMENTS.—The common law appropriates payments most beneficially to the creditor, and the civil law most beneficially to the debtor; and this state has adopted the rule of the civil law.

5. SAME—PRACTICE—CONFLICT OF TESTIMONY.—If, upon proceedings to enforce a mechanic's lien, there be a palpable conflict of testimony, such conflict creates an issue which should be submitted to a jury; but the appropriation of payments must be made by the court.

6. APPROPRIATION OF PAYMENTS—FRAUD—ESTOPPEL.—Though the defendant to a suit on a fraudulent promissory note, made to hinder or delay creditors, may not be allowed to impeach the note, a *bona fide* creditor of that defendant may do so upon a question of appropriating payments in which he is interested. Personal judgments conclude only the parties to them and their privies.

7. UNCONSCIENTIOUS ADVANTAGE.—He who, pending an injunction sued out by himself to restrain a mechanic's lien, obtains a tax title to the property upon which the lien is sought, is thereby guilty of attemping an unconscientious advantage, and will not be allowed to use his tax title to defeat the mechanic's lien. The tax title must inure to the benefit of the parties.

8. EXAMINATION OF WITNESSES.—Upon affidavit under the statute (Rev. Code, § 1076), by one of the parties, "that the oral examination of one of the opposite parties in open court is essential to the ends of justice," etc.; and it appearing that the party sought to be so examined was a mortgagor of one undivided moiety of the property in controversy, with the equity of redemption as against one of the other parties, it was error to refuse such examination in open court.

APPEAL from the chancery court of Hinds county. CABANISS, Chancellor.

The opinion of the court contains a sufficient statement of the case.

*Harris & George,* for appellant.

The history of this case, so far as it relates to the appropriation of payments, is substantially as follows:

In the spring of 1857, J. & T. Green took a mortgage from Bowman, on the land on which the Bowman house was then being built, for about $5,500. Soon afterward the defendant, McLaughlin, made a contract to do the plastering on said house, and commenced work. In November, 1857, the Greens took another mortgage from Bowman to the amount of about $2,881. McLaughlin commenced his suit to enforce his lien in January, 1858, and within the time limited by the statute.

Immediately after the execution of the last mortgage to the Greens, Bowman opened a deposit account with them, which continued until 1860, and when he ceased drawing on these deposits there was a balance of cash on this account, in his favor, of about $5,144.

The first item on this deposit account is November 12, 1857, and the last item of debit to Bowman is March 19, 1860, and the last item of credit to him is December 1, 1860.

The whole amount of deposit by Bowman on this account is $7,287, and of checks drawn by him is $2,142.48; showing an excess of deposits over checks of $5,144.52.

A note was given by Bowman to J. & T. Green, on the 29th of April, 1859, for $14,420. J. Green swears the note is genuine; Bowman swears it is bogus. There is an unsigned deed in trust given to secure this note which was never recorded.

The said cash balance on the deposit account is credited on this note as of date the 19th of December, 1860; but the proof shows that the entry in the books of the Greens is in pencil, and is dated the 11th of April, 1861, and is as follows: "Credited on his note, $5,144.52," without stating what note.

Bowman had two accounts made out, in pencil, by Thomas Green, one of which was an account of his principal indebtedness; the other of the interest.

These accounts contain, as items of debit to Bowman, the two mortgage notes for $5,502.48 and $2,881.16, and three other items of debit taken from the deposit account before referred to.

These three items are what remained of the debit side of the deposit account after eliminating from it all the other items, and which said items so eliminated are accounted for by cancellation from the credit side of the account of items, the same in amount and about of the same date as those left out from the debit side; so that the result or final balance of said deposit account is exactly the same in these accounts, so rendered, as if every item on each side of the deposit account had been entered.

The two accounts have no other date than that the interest is calculated to 1st of December, 1861, which must, therefore, be considered the true date of both.

In 1867, the Greens sued Bowman, at law, on these two first mortgage notes, he being insolvent (omitting, however, any suit on the note for $14,420). Bowman pleaded payment; but a verdict was rendered against him for the whole amount of these two notes.

It is well to remark here, that there is not a single trace of this $14,420 note on the books of J. & T. Green; that Thomas Green, one of the partners, knows nothing of it; that W. B. Taylor, their book-keeper, never knew or heard of it till the summer of 1872, when, being requested to examine the books of J. & T. Green, he goes there, and J. Green mentions, for the first time, the fact of his holding it; that Bowman swears that it is bogus, delivered to defraud his creditors; that it is of the same date of two other notes made by Bowman to J. & T. Green for over $6,000, which are retained by the Greens and are now in their possession, and which they acknowledge are not due; that Bowman's credit was not then good with the Greens, and they required deeds of trust or mortgages for the advances

which they had made, even when the advance was only $2,881; that the mortgage delivered with this $14,420 note was never signed by Bowman and never delivered for record, and that Bowman was then, the 29th of April, 1859, in advance on his deposit account several thousand dollars, and so remained until the close of the account; and moreover, that the Greens were his depositaries, and that the proceeds of this large note were never deposited by Bowman with them and checked out, as is the usual course of business; nor, notwithstanding Bowman's denial of ever ·having received the money, is there any effort made to show what Bowman ever did with it—either that he paid debts or purchased property.

No reason appears why said large loan was asked for or made; and it further appears that on the 1st of December, 1861, an account was rendered, as before stated, to Bowman, showing balance of debt due by him, in which are included the two first mortgage notes and all other transactions between Bowman and the Greens, and from which is omitted the $14,420 note; and that Bowman, as to his testimony on this point, is entirely disinterested, since he is a discharged bankrupt; and, moreover, the matter in controversy is solely between the Greens and McLaughlin, and that, conceding the note to be bogus, still it is binding on him.

It is not denied that this judgment concludes Bowman, but we are not aware of any principle which authorizes it to be considered as binding on McLaughlin.

The rule on this subject is thus stated by Starkie: "A judgment is always admissible in evidence to show the fact that it has been rendered, and the legal consequences of its rendition." Thus, a conviction for perjury may be introduced in evidence in any suit to show that it has been rendered, and that the convicted party

is thereby rendered infamous.  1 Stark. Ev., marg. p. 255.  On the other hand, it is said that it is an elementary rule and principle of justice, that no man shall be bound by the acts or admission of another, to which he was a stranger, and, consequently, no one ought to be bound, as to a matter of private right, by a verdict or judgment to which he was not a party, when he could make no defense, from which he could not appeal, and which may have resulted from the negligence of another, or may have been obtained by fraud and collusion."  And, therefore, except as between parties or privies, a judgment is no evidence to prove the matter on which it is founded, *i. e.* to prove the debt or trespass or title which is adjudicated by it.  See Pickett v. Ford, 4 How. 246 ; Lipscomb v. Postell, 38 Miss. 476.

· McLaughlin certainly was not a party to this judgment.  He is as incontestably not in privity with either party.

Even a decree of foreclosure, in a suit between a mortgagor ˙ and mortgagee, is, as to junior incumbrancers, and all other parties entitled to redeem, *res inter alios acta.*   Gorden v. Hobart, 2 Sumner, 401, 407.

The question, then, whether these mortgage notes have been paid, is to be determined without reference to that judgment.

As preliminary to this, it may be as well to show that if the mortgage has been in law paid, that no agreement, or understanding, or arrangement, between Green and Bowman can operate in the least to keep it alive against a creditor of Bowman ; and that creditors of Bowman have a right to insist on such payment. This is expressly settled in Marvin v. Vedder, 5 Cow. 674 ; and the position is so clear that it has been rarely controverted.

A subsequent mortgagee or incumbrancer has all the rights to the estate as a security for his debt, except the prior mortgage.  As long as that legally subsists,

he is postponed to it; but he has the right to have it legally discharged whenever the debt on which it is based has been extinguished. As to him, whenever that fact transpires, there is no longer a valid and legal interest paramount to his, whatever may be the position of the mortgage as between the mortgagor and mortgagee.

This brings us to the discussion of the facts and the principles of law, in relation to the appropriation of payments.

The common law doctrine on this subject is evidently derived from the rules of the civil law, and for a long time the courts of England adhered closely to these rules. See Patteson v. Hull, 9 Cow. 773, and the very learned note of Judge Cowen's appended to it; and Gass v. Stenson, 3 Sumner, 99; Bussey v. Gant's adm'r, 10 Humph. 242.

Afterwards there was a divergence from the civil law rules by the common law courts, in the main, though some (and among them the high court of this state) adhered to the civil law throughout. Both these systems agree that the debtor has the first right to make the appropriation; and both agree that if he fails to exercise this right, it then devolves upon the creditor. The civil law required, however, that this right, when it devolved on the creditor, should be exercised at the time of the payment and as part of the *res gestæ!* Pothier on Obligations, pt. 3, ch. 1, art. 7, rule 2, marg. p. 528; Logan v. Mason, 6 Watts & Serg. 9, 14. The common law courts have, however, extended this time indefinitely to the creditor, in most cases, where there is no other rule of law which of itself makes the appropriation.

The civil law made the application in all cases, as a rule of law, when no application was made by either party at the time of payment; and by the third rule (see Pothier, *supra,* p. 530), the application was to be

made most beneficially to the debtor. From this point, the courts not following the civil law, began their divergence from it—these courts making the application most beneficial to the creditor.

The high court of this state has distinctly and deliberately adopted the civil law rule, as to the application of payment for the benefit of the debtor. Hamer v. Kirkwood, 25 Miss. 99; Poindexter v. La-Roche, 7 S. & M.

It has also distinctly repudiated the right of the creditor to make the application at any time. For it will be noticed, that in those courts where it is allowed to the creditor an indefinite time to make the application, the right has been allowed to be exercised even up to the time of trial, or at least to the beginning of the action, which of itself amounted to an application of the payment (see 1 Am. Lead. Cas. marg. p. 281, 282); and the high court has refused this in the cases above cited, as in others which will be cited hereafter.

The rule of the civil law has been explicitly adopted by the courts of this state. This rule may be expressed in this way: That when no application is made by either party, at the time the payment is made, the law, recognizing the right of the debtor to make the application, will apply it, as it will presume he intended, viz: in the way most beneficial to him, whenever the debts are of unequal burden, i. e., to a mortgage in preference to a simple contract debt; to a debt bearing interest in preference to one not bearing interest; and when the debts are of equal dignity, and equally onerous, then to the debt first falling due.

In Poindexter v. LaRoche, 7 S. & M. 699–713, the rule is laid down in this way: "If a debtor is indebted on mortgage and simple contract, or on bond and simple contract, and when he makes a payment, should neglect to apply it, the law will make the application in the way most beneficial to the debtor, that is, to the

mortgage or bond." And, for the same reason, in Hamer v. Kirkwood, 25 Miss. 96, payment on a judgment was applied to that part of it bearing interest to the exclusion of that part which bore no interest. In both these cases, if this indefinite right of application existed in the creditor, no such decision could have been made; the court would merely have registered his will.

These authorities settle that, as between the two mortgage notes on the one hand, and the $14,420 note on the other, the payment must be applied to the former. But there is another rule recognized by both the common and the civil law, which compels this application to be made. The fourth rule, as stated by Pothier (p. 531), is: "If the debts are of equal natures, and such that the debtor had no interest in liquidating one rather than the other, the application should be made to one of longest standing."

This principle has been recognized in several cases in the high court. Miller v. Leflore, 32 Miss. 634; Scott v. Cleveland, 33 ib. 447. These cases are authoritative against the application to the $14,420 note, as that was the latest of all notes. And they also settle, that between the two mortgage notes the payment must be applied to the oldest. In Miller v. Leflore, the court said, "that the question being settled that each note was a separate contract, falls within a familiar rule—that contracts must be performed in the order in which they are made—the defendants (debtors) undertook to pay, and the plaintiffs (creditors) undertook to receive payment of the first note before payment of the second note, and so on in order until all the notes were paid." The same principle is recognized in Effinger v. Henderson, 33 Miss. 449.

II. But leaving out all consideration of these rules, there has been an express application of these credits to the two mortgage debts.

Two accounts have been rendered by the Greens to Bowman, in which these payments or deposits have been specially applied to these two notes (see Am. Lead. Cas. marg. p. 278), and the appropriation thus made is irrevocable.   Simpson v. Graham, 2 Barn. & Cress. 65 (9 E. C. L. 37–41).   The appropriation by the creditor may become fixed so as to be beyond his power to change it ; and this is done by rendering an account in which the appropriation is made.   1 Am. Lead. Cas. *supra*.   An appropriation by a mere mental act or an unexpressed intention, or by an entry not communicated to the debtor, is subject to be changed.   The court's attention is called on this point, especially to the cross-examination of the Greens when they were examined in court.

But it will here be argued, that as the two notes were embraced in one general account, and the credit so applied, and as there was a general balance still due, that this general balance shall be applied *pro rata* to the two notes, whereby a large sum will still be due on the first mortgage.

The answer to this is the general principle before stated ; that is, that this balance shall only be considered as due on the last note, and on so much of the first note as would remain unpaid in case all the credits had been applied to it.   Scott v. Cleveland, 33 Miss. 447, is a conclusive authority that when the debtor makes out a general account, in which all the claims of indebtedness are charged and added up together, and then all the credits put in and added up, and the sum thus produced deducted from the sum of all the debts, and a general balance thus produced, this is not such an appropriation as will prevent the operation of the rule of law requiring the credits to be applied first to any particular items in the account in preference to the others.

- In that case the items which by law were first

entitled to the application were considered as paid, and the general balance, after deducting credits, was considered as due on the items not entitled to priority or even equality according to law.

III. But there is another consideration which conclusively settles the question.

The Greens expressly state that the deposit account on which this balance was raised was opened under the express contract and understanding that the moneys so deposited were to be subject to the check or order of Bowman, without reference to any debt he might owe them; that Bowman was at liberty to check out every cent of it. Or in other words, the money so deposited by Bowman was his money and subject to his disposal without reference to any indebtedness of his to the Greens. No rescission, express or implied, of this agreement ever took place. Joshua Green swears that there was none, and that he made the appropriation to the $14,420 note because he so elected. Under every rule of the common or civil law, Bowman had the right when he ceased to check to make the appropriation or disposition. No opportunity was ever offered him to do so. Hence, as a matter of course, a logical necessity —the right of the Greens to make any appropriation being dependent on Bowman's declining to do so—it follows that no appropriation of it by them could be made, as Bowman never had declined, nor even had an opportunity of doing so, except to assent (by keeping the accounts rendered, exhibits Q and X, without objection, in which the appropriation was made) to its application to the mortgage notes. We rely on this consideration as absolutely conclusive on the question of the appropriation.

IV. In April, 1868, McLaughlin, having got this judgment against Bowman & Hilzheim, was about to sell the property.

The Greens, on the 4th of that month, interfered by

injunction and prevented the sale; in the next July the property was sold for taxes, struck off to the state, and after the two years for redemption had expired the Greens bought it, and now set it up against McLaughlin.

We answer, they cannot do it. They, under the mortgage from Bowman, were, as they claimed in their injunction bill, the legal owners of one-half interest, and under the mortgage from Hilzheim were the equitable owners, if not the legal owners, of the other. They were also entitled to the possession, and there being no one in adverse possession, they are to be considered as in possession. The law made it their duty to pay the taxes, which was a debt against them, and not against the property. They refuse to pay and at the same time enjoin McLaughlin, who has only a lien, which is neither a *jus in re* nor a *jus ad rem*, from perfecting his title by a sale, upon the ground, as alleged in their injunction bill, sworn to by them, that they are the owners and entitled to it, as against McLaughlin.

Can they now, after tying his hands, after asserting title and ownership, cast the burden of ownership on him? and on his failure and their failure to discharge these burdens, claim the advantage of a purchase acquired by their own default? It is too clear for controversy that they cannot.

This has been settled by the decisions of this court. In Marshall v. Minter, 43 Miss. 666, it was said that a court of equity will regard a party applying for an injunction to restrain the execution of legal process, as proposing or consenting that, if such injunction be improvidently obtained, or the relief asked shall be refused, he will put his adversary in the same condition he was in at the time the injunction was granted. And so, in Work v. Harper, 33 Miss. 107, a mortgagee who had restrained a judgment debtor from selling until his

lien was barred, was prevented from taking advantage of the loss of the lien thus occasioned.

When a party asks the interposition of a court of equity to prevent the sale of property on which his adversary has a lien, the property will be considered as in *custodia legis* during the litigation, at least to the extent of preventing the party suing out the injunction from acquiring rights through the delay thus occasioned, inconsistent with the lien of the other.

V. It was insisted in the court below, that, inasmuch as the building was destroyed by fire, no lien remained to McLaughlin, and two Pennsylvania cases were cited for that position: Presbyterian Church v. Stetter, 26 Penn. 246; Wegden and Brookes' appeal, 28 ib. 156.

But these cases are founded on the particular wording of the statute of that state, and are not followed by any other cases in the Union. See Schwartz v. Landers, 46 Ill. 180, and numerous cases cited in the opinion of the court.

There is a wide difference between our statute (under which this lien accrued) and the statute of Pennsylvania. That gives the lien only for the erection of the building; ours gives it, not only for that, but also for repairs; and ours gives it, not only on the building, but on the building and materials.

The Pennsylvania statute extends the lien only to buildings erected, and it is held to be lost when the buildings cease to be an erection by destruction; ours not only extends to the building, but to the materials furnished for that purpose.

These materials, out of which the building was made, are as much materials after the destruction of the building as before. There certainly can be no doubt as to that. And in Otley v. Haviland, 36 Miss., the right of the mechanic to remove the building was asserted.

The Greens' mortgage, when they took it, could only have the force and effect allowed by the law as it existed when the mortgage was made. If that law declared that the mortgage, when given, should be subordinate to the lien of a mechanic, created afterward, it must be considered that the mortgage contract was made with reference to it, and that the parties deliberately assented thereto. This lien can no more be said to be a divestiture of the vested right of a mortgagee, whose right accrued after the commencement of the building, than it is of a mortgagee's rights commencing before that time, or of the rights of the real owners; for it is settled that, as against all persons except a mechanic having a lien, the title of the owner and mortgagee extends to all erections on the land, by whomsoever made. They become a part of the soil; yet it is well settled that, as to these, the mechanic's lien is perfect. Otley v. Haviland, 36 Miss. 19; Weathersby v. Sinclair, 43 ib. 189. And this lien, so far as the building was concerned, was held to be superior to the rights of a *bona fide* purchaser for value. Buchanan v. Smith, 43 Miss. 90.

It is argued, however, that the statute only protects the mechanic against liens strictly, and not against a mortgage, which is something more than a lien, being a conveyance of the fee. The answer will be found in the object of the statute, to favor laborers, the language employed, "any other lien whatsoever," and in its settled construction by this court.

In Otley v. Haviland, 36 Miss. 37, 38, the lien of a mechanic is sustained against a prior mortgage expressly on the force of the language above quoted, that it shall have preference " over all other liens whatsoever." See page 38 of that case. And in Buchanan v. Smith, 43 Miss. 90, it was sustained against an absolute conveyance.

Although, as between mortgagor and mortgagee, the

mortgage is a conveyance, yet, as to all others, before forfeiture of condition and entry by mortgagee, it is but a lien, leaving the mortgagor in possession as owner. Howard v. Robinson, 27 Miss. 123; but Otley v. Haviland, *supra*, is conclusive.

VII. The facts, so far as they relate to the lien as against Hilzheim's interest, are as follows: Bowman was the owner of the whole fee in the lots, and had commenced the erection of the hotel. He was the donee of an extensive retailing privilege, and certain sums subscribed by the citizens as a bonus to secure the erection of a hotel. On the 15th of September, 1856, Bowman and H. Hilzheim entered into a written contract of partnership, by which H. Hilzheim was let in as a partner from the beginning, including the bonus and liquor privilege, and Bowman put in the lots at $6,000, and after allowing credit for that, Bowman and Hilzhem were to make equal investments, erect a first-class hotel; each party was to be allowed to buy material and hire labor at current rates, "and upon the completion of the building" there was to be a settlement of accounts; and upon adjusting balances so that each shall have made equal investments in the property, then Bowman was to convey a half interest in the property to Hilzheim; but, in the meantime, he was to hold the title as security that Hilzheim would make the investments equal to Bowman. The agreement was concluded with this stipulation: "It is further agreed that the hotel property and building are at all times liable for the debts of every description created in the erection of the same or for the benefit thereof, just as if the debts were partnership debts and the property were partnership and personal property."

This contract was incorporated in the mortgage which Hilzheim made of his interest to the Greens, and was put on record 6th of January, 1859, when for the first time the mortgage of Hilzheim to the Greens

was recorded.    The Greens took an assignment of this interest of H. Hilzheim as security for a loan, and bound Hilzheim to carry out his contract with Bowman to erect said building.    This contract is dated 6th of February, 1857, prior to Bowman's first mortgage to Greens; and here it may be remarked in connection with the argument on the last preceding point, that this agreement shows that the Greens contemplated, and in fact, had a contract with Hilzheim, that the building should be completed, and that they had full notice when they took the mortgage from Bowman, that there was a contract between Hilzheim and Bowman, by which the property should be liable for the debts created in its erection.    And now it is gravely argued that Hilzheim, who, by this contract, was a partner of Bowman—the legal title being in Bowman, for the benefit of the partnership; and there being an express agreement, that the property shall be liable as partnership property, for the payment of all debts created in the erection of the building—had no such interest in the building as would be liable to a judgment enforcing a mechanic's lien against both him and Bowman.    The proposition is too absurd for argument, and as such we dismiss it.    But it is further argued, that, even if against Hilzheim, McLaughlin had a lien, yet he has no such lien as against the Greens, claiming under an unrecorded mortgage from Hilzheim.

The argument is this: That the mechanic's lien is a statutory right entirely; when not given by the statute it does not exist; that the statute gives the lien on the land only in the event that there is no other lien on the land in existence; that the Greens' mortgage being prior to McLaughlin's, though not recorded for eighteen months afterwards, was nevertheless a lien in existence, and that, as the statute on the subject of mechanic's lien says nothing of notice, and as McLaughlin had notice before any sale under his lien

(there has been no sale yet), therefore the registration laws requiring registration of mortgages are not in force, so far as mechanic's liens are concerned, and as the Greens' equity or lien is prior to McLaughlin's, it must prevail.

This argument, if correct, accomplishes a very extraordinary result, in excluding from the benefit of the registration laws, a single class of creditors only, whose interest were supposed to be the especial objects of the care of the legislature. The statute of registration enacts that all deeds of trusts and mortgages shall be "valid as to all subsequent purchasers for valuable consideration, without notice, and as to all creditors, from the time such mortgage, etc., * * * shall be acknowledged, etc., and delivered to the clerk of the proper court for record, and from that time only." Hutch. Code, p. 606, § 5. This statute, so far as creditors are concerned, has heretofore been explained to mean, that the unregistered mortgage has no effect as to creditors, who gave to the mortgagor credit upon the faith that he was the owner of the property unincumbered. Moss v. Davidson, 1 S. & M. 112; Pickett v. Banks, 11 ib. 445. See, also, Butterfield v. Stanton, 44 Miss. 15. And also, that it is of no avail as against a creditor who has acquired a lien on the land before registration, or notice of the mortgage. Henderson v. Downing, 24 Miss. 106; Barker v. Stacey, 25 ib. 471; Lindsey v. Henderson, 27 ib. 502; Kelly v. Mills, 41 ib. 267; Work v. Harper, 24 ib. 519; Harper v. Tapley, 35 ib. 506, which refer to a judgment lien before notice or registration; Pomet v. Scranton, Walk. 406, which refers to a subsequent mortgage.

McLaughlin comes under both heads. He gave the credit on the faith of the apparent ownership in the property by the partnership of Bowman and Hilzheim, and he even comes under the strict rule laid down in Butterfield v. Stanton, 44 Miss. 115, because, as the

law gave him a specific lien on the property for his labor as a part of his contract of employment, he must be considered as having given a credit on this property to which his lien attached. And he is strictly in the rule laid down by the other class of cases, because his lien attached by his contract to do the work. Bell v. Cooper, 26 Miss. 650.

The action was commenced against several parties as partners of Bowman and H. Hilzheim, but upon their disclaimer of interest was discontinued as to them. It was also commenced against P. Hilzheim, and upon his death was discontinued as to him, because no title or interest could be traced in him, and was then continued against Bowman and Hyman Hilzheim alone, and judgment was rendered against them.

It is now insisted that this judgment did not bind Philip Hilzheim's heirs, or Mrs. Antoinette Hilzheim, his widow.

The exhibits filed by complainant show that Philip Hilzheim never had a particle of interest in the property—Mrs. Antoinette Hilzheim did have such an interest—but it was acquired after the hotel was built, and after the institution of McLaughlin's suit. She had no conveyance of the property, but only of a share in the rents. McLaughlin swears he had no notice of her claim. It was never put on record. It commenced after the suit was commenced, and of course being a purchaser *pendente lite*, she is bound by the judgment.

*T. J. & F. A. R. Wharton*, on same side.

*Shelton & Shelton*, for appellees.

McLaughlin attempted to defeat the oldest mortgage by the pretense that it had been paid. To succeed, he must have proved the payment clearly.

His first effort was to prove usurious interest. J. Green, witness for McLaughlin, testified it to be $133,

and no more.   J. & T. Green filed a transcript of a judgment at law, rendered on that note in favor of J. & T. Green for the full amount of the note, principal and interest, which transcript showed that Bowman pleaded to and defended the action at law.   For three reasons McLaughlin was not entitled to deduction of $133 :

1. Because a third person who was not a party to the usurious settlement cannot successfully urge the objection of usury to the note or mortgage.   3 Pars. on Cont. 123 ; 13 Mass. 515 ; 11 Paige, 625.

2. Because no one can raise the question of usury after it has gone into judgment.  3 Pars. on Cont. 120 ; 3 Johns. Ch. 395 ; 17 Johns. 436.

3. Because not a dollar of McLaughlin's debt had been incurred, and his contract had not been made, at the time Bowman's note and mortgage were made and recorded ; McLaughlin then had no interest in the transaction, and was not injured by Bowman's allowing the small excess of interest.

McLaughlin's next and principal effort was to get rid of Bowman's first mortgage by showing or procuring an appropriation of $5,144, balance to Bowman's credit on deposit account with J. & T. Green, on 19th December, 18—, towards payment of that first mortgage note.

Bowman, examined after the Greens, says that the whole transaction was bogus, and a fraudulent device to protect him against his creditors ; that he never received or expected to receive the value of a dollar on the $14,000 note and mortgage ; that he never received or expected to receive the value of a dollar on the deeds to the Sunflower lands ; never asked for or expected the Greens to do anything or give anything for them except to hold them against his (Bowman's) creditors, as his (Bowman's) friend and confederate. In brief, he denies every statement of the Greens (McLaughlin's witnesses) in reference to the loan on the

Bowman House, and also in reference to his asking the loan of their notes on the Sunflower lands.

In response, Joshua Green, now a witness for J. & T. Green, produces and files the unsigned notes written by Bowman, for their signature; they are payable to him, they are in his handwriting, and express on their faces that they are for the Sunflower lands.

Possibly it may be urged in McLaughlin's behalf, that in this suit he can re-try the question of the amount of Bowman's indebtedness on the two first mortgage notes, for the sole reason that he (McLaughlin) was not a party to that suit. We recognize the general principle that only parties and privies are bound by adjudications, but the true question is, who are regarded as privies in law. The answer is, "that all persons who are represented by the parties, or claim through or under them, or in privity with them, are concluded by the result of the first suit. * * Privity denotes mutual or "successive relationship to the rights litigated. * * The ground upon which persons standing in this relation to the litigating parties (in the first suit) are bound by the proceedings in that suit is, that they are identified with him in interest, and wherever this identity of interest is, all are alike concluded." 1 Greenl. Ev. 523.

In all cases the record of a judgment is evidence where the rights of parties are dependent on the rights of the parties to such judgment. 14 Md. 86.

This case directly responds to the foregoing principles. McLaughlin's claim is, that Bowman does not owe the first mortgage note because he is entitled to a credit thereon of $5,144. That is just what Bowman himself litigated in the action at law. Now, in this case, McLaughlin claims nothing as to that credit in his own behalf, but that Bowman is entitled to a credit of $5,144, and that he is entitled to it only because Bowman is entitled to it. He sets up no right or

defense of his own, but only his equity, because of and founded on a supposed right of Bowman. But the judgment is conclusive that Bowman has no such right; therefore McLaughlin has no such equity. The whole case is one of substitution. That Bowman has a defense to the first mortgage note; that, as Bowman's creditor, McLaughlin has the right, in defending against that note, to stand in Bowman's shoes. That is the true doctrine. But the judgment is conclusive that Bowman has, since its rendition, no shoes to stand in, and therefore he cannot supply them to McLaughlin. McLaughlin's claim is only that of a legal defense existing in Bowman, and imputed to McLaughlin, as his creditor, through chancery; but, if the legal defense does not exist in Bowman, there can be no imputation of it to McLaughlin. Since the judgment at law no defense can exist in Bowman. The relative positions of McLaughlin and Bowman in relation to that defense is precisely such as is described in the principles of law above quoted as constituting privity in law.

This doctrine must be correct; for if it be not, then in all cases of collusion between judgment creditors, each creditor, without impeaching the judgment, might open the original controversy to prove the debt not due, or payment, or set-off in behalf of the judgment debtor. So McLaughlin's lawyers thought when in their answer they set up their judgment as conclusive of their debt and incumbrance.

The language of the statute gives the lien on the land only in the event of there being no other lien on the land in existence. Hutch. Code, 628. There is not a word said about notice or no notice. But the lien of a mechanic is the creature of the statute, and exists only to the extent prescribed by the statute. 43 Miss. 99.

Plainly, the object of the statute was that the mechanic should have on the land only an incidental lien,

growing out of the more absolute lien on the house erected by the mechanic, where such a lien on the land came in collision with no other lien or incumbrance on the land; but where such lien or incumbrance existed, then the mechanic's lien on the land was only co-extensive with the builder's right in the land; in this case only on the equity of redemption. Such is the extent of the statute. The legislature so pleased to restrict the lien and not to put it as between the mechanic and other incumbrancers on a question of notice or no notice. The language of the statute must fix the limits of the mechanic's lien. 44 Miss. 506; Nott on Mech. Liens, 103, 109, 111.

McLaughlin certainly is not a purchaser for a valuable consideration without notice, for to this day he has never purchased the property; his protection can, therefore, be claimed only as a creditor without notice of Greens' incumbrances. Against him, as a creditor, the mortgages took effect from the time they were recorded, which was long before his judgment was obtained. But a creditor is not protected under the statute uless he has enforced his debt by judgment and execution before notice of a prior unregistered mortgage. Hutch. Code, 606, § 5; 24 Miss. 106; 25 ib. 471; 41 ib. 267; 7 S. & M. 406.

While it may be true that in equity such an interest could be the subject of a mechanic's lien, yet it is also true that such an equitable interest could not be subjected to such a lien by proceedings at law, and a sale made under such proceedings at law would convey no title or interest (43 Miss. 315; 36 ib. 37); nothing less than a bill in chancery could subject such an interest to sale. That chancery proceeding has never been begun, and the lien was extinguished by limitation long before J. & T. Green filed their bill in this case.

But even if it were true that McLaughlin's lien was still valid against that equity, it could not have pre-

ference of Greens' older incumbrancers on the equity, for even if their equities be equal between such incumbrancers, he who is first in time has preference in law. 43 Miss. 349 ; 23 ib. 173.

The statute (Hutch. Code, 627) gives to a contractor for the erection or repairing of any house, or for furnishing labor or material for the purpose aforesaid, and to every other person who may have furnished materials actually used in the construction of such house, a lien to secure the payment for the same upon the building and "materials aforesaid," and said buildings and "materials aforesaid" shall not be subject to any other lien until said lien shall be canceled.

Under this act there are two things on which a mechanic's lien can take effect : one is the building, the other is the "materials aforesaid." The mechanics and furnishers of materials severally had liens on the building as a common security. But the building being destroyed, and only a portion of the materials left, has one mechanic a preferred lien on remaining materials furnished by another person, or has he a preferred lien only on the materials furnished by himself. For example, Graves furnished and laid the brick, McLaughlin did the plastering, and a saw-mill man furnished the lumber. The burning of the house annihilated both the plastering and the lumber—only the bricks are left ; who has the preference lien on them as remaining materials of which the house was built ? has the plasterer and lumberman, whose materials and labor were wholly destroyed, such a lien on the bricks furnished by Graves ? Certainly Graves would hold the bricks, the others would have no lien on them.

The statute, in declaring a preference lien, says it shall be on "the materials aforesaid," that the "materials aforesaid" shall not be subject, etc. What "materials aforesaid?" The previous lines of the act define what materials are "aforesaid;" they are

those which "every" person (that, is each, not all)
shall have furnished for the construction of the house,
and for which the person or persons furnishing them
should "respectively" have such a lien. It is language
expressing severalty as to materials as well as to lien,
not a several lien on all the materials jointly.

McLaughlin's lien on materials furnished by Graves,
while in the house, operated, not on the materials as
materials, but on the house as a house, and so of every
other mechanic, and while it stood they all had pref-
erence liens on the whole building as a security common
to all ; but when it was destroyed, only materials re-
mained on which any incumbrance could operate, and
as to these the statute gives the preference lien only on
those furnished by McLaughlin, and not on those
furnished by Graves. This has been so decided in
Pennsylvania, where the lien is given only on the
building and land, just as ours does, but not on the ma-
terials. It was there expressly held that the lien on the
lot was a mere incident to the lien on the building ;
that the destruction of the building destroyed the lien
on the remaining materials, and thereby the lien on
the lot was also lost.    26 Penn. St. 247 ;  28 ib. 163.

Again ; it has never been decided that because a
mechanic does part of the work on a building, or
furnishes part of the material, he not being the con-
tractor to erect the building, that therefore he has a
lien on the whole building to the exclusion of all prior
incumbrances on the land, and so far as there have
been intimations they have been adverse to such a
doctrine.    23 Miss. 314 ;  36 ib. 38 ;  43 ib. 101.

In this case, the bricks must go with the lots to pay
Greens' mortgages first.

Now, he who has an equal equity, may, if he can,
acquire the legal estate, and with it protect his equity ;
for in such cases a court will not take away a legal ad-
vantage, but give effect to it as a protection to his

equity.    7 Cranch, 2 ; 10 Pet. 179 ; 2 Wash. C. C. 441 ; 21 How. 215, 494 ; Jer. Eq. 285.

But it is said that the equities are not equal in this case.    If there be any distinction, it is in favor of Greens' older incumbrances, for *qui prior est in tempore potior est in jure.*    The debts to the Greens are as well founded on value as McLaughlin's debt is.    It is simply a controversy between two *bona fide* incumbrancers, in which controversy the Greens hold priority of time, priority of incumbrance, and the legal title purchased from the state.    No court of chancery will deprive them of these legal advantages over an adversary of no more merit in equity or good conscience.    Between equities otherwise equal, the party holding the legal title will always prevail. 24 Miss. 634 ; 32 ib. 349, 617.

At this point we might close our argument of this cause, for we have argued the propriety of the decree, and we confidently believe that it will not be reversed. Nevertheless, if this court should so far differ from the chancellor as to reverse the decree, then it may become material to inquire what shall be done with the interest of one-fourth owned by Mrs. Antoinette Hilzheim.

We contend that the fourth interest of Mr. Hilzheim is not subject to McLaughlin's lien, and is therefore subject only to the Hilzheim ·mortgages to J. & T. Green.    It might have been subjected to McLaughlin's lien (by chancery), but it was not ; she was no party to his suit.    McLaughlin had notice of that interest before he obtained judgment against Bowman and H. Hilzheim on his lien, because that which put McLaughlin on inquiry was notice.    43 Miss. 260, 347 ; 1 S. & M. 70 ; 41 Miss. 267 ; 5 S. & M. 545.

The fact that Philip Hilzheim was, until his death, a defendant to McLaughlin's petition for lien, the affidavit of Bowman filed in that case at the May term, 1869, proved in this case by Bowman and by Wharton,

the testimony of Wharton and the demurrer proved in this case by Wharton, which shows that Bowman and H. Hilzheim filed pleas at the May term, 1869, setting up Mrs. Hilzheim's interest,—these things show that as early as the May term, 1869, McLaughlin had direct notice of Mrs. Hilzheim's interest, and that Bowman and H. Hilzheim then and afterwards endeavored to compel McLaughlin to make her and the children of P. Hilzheim defendants, by *scire facias*, and that McLaughlin refused to do it, doubtless supposing that he had ample security in the interest of Bowman and H. Hilzheim.

Peyton, C. J.:

In April, 1858, Michael McLaughlin filed his petition in the circuit court of Hinds county, against James H. Bowman and Hyman Hilzheim, to enforce his mechanic's lien on lots numbered 1 and 2 in fractional square number 1 north, in the city of Jackson, and the buildings thereon, for plastering done by him during the fall of 1857 and the winter of that year; and on the 27th day of November, 1867, he obtained a judgment against said Bowman and Hilzheim for the sum of $5,687.59.

On the 4th day of April, 1868, J. & T. Green filed their bill in the chancery court of said county for an injunction restraining the collection of said judgment, and for a foreclosure of certain mortgages executed by said Bowman and Hilzheim, respectively, on their respective interest in the lots of ground sought to be subjected to the mechanic's lien.

The bill makes James H. Bowman, Hyman Hilzheim, Michael McLaughlin and the widow and heirs of Philip Hilzheim parties defendant to the suit. And on the final hearing of the cause, on bill, answers, exhibits and proofs, the court decreed that the oldest mortgage made by Bowman of his legal interest in the property, and those made by Hilzheim of his equitable interest

therein, are charges and claims paramount to the me-chanic's lien of McLaughlin, and entitled to prior sat-isfaction out of the proceeds of the sale of the property, and directs the property to be sold and the proceeds applied, after payment of costs, to the payment of the sums of money found due J. & T. Green on said mort-gages, and the balance, if any, to be applied to the payment of McLaughlin's claim.

From this decree McLaughlin appeals to this court, and insists that his lien has a priority over all other liens and charges set up in the pleadings in the cause. And this presents the main question in the case, which involves in its solution the consideration of other ques-tions, such as the right of making appropriation of payments, and the effect of Green's tax-deed upon the rights of McLaughlin, and others of minor importance discussed by counsel in the argument of the cause.

The record shows that James H. Bowman was indebted to J. & T. Green in the sum of $5,502.48 on the 13th day of March, 1857, as evidenced by his promissory note of that date. This note was secured by mortgage to the said Greens on his interest in the lots of land in controversy, made by said Bowman on the 19th day of March, 1857, which was duly acknowledged and filed for record on the 8th and recorded on the 17th day of April, 1857; and that, on the 18th day of October, 1857, Bowman was indebted to said Greens in the fur-ther sum of $2,881.16, by his note of that date, which is also secured by a mortgage of his interest in said lots, executed by him to the Greens on the 25th day of November, 1857, which was filed for record on the 9th of December, 1857, and recorded the 21st of Decem-ber, 1857.

The record also sets out an agreement entered into on the 15th day of September, 1856, between James H. Bowman and Hyman Hilzheim, by which Bowman agrees to convey to said Hilzheim one-half interest in

the lots in dispute, and they were to build a hotel thereon in partnership, Bowman reserving to himself the legal title to the real estate as a security for the performance by Hilzheim of his part of the agreement.

Hyman Hilzheim, being indebted to J. & T. Green, in the sum of $8,957, mortgaged to them his equitable interest in one-half of said lots on the 6th day of February, 1857. This mortgage deed was acknowledged on the 3d day of December, 1858, and was never recorded. And being further indebted to said Greens by his note for $5,500, dated the 15th of April, 1857, and payable the 15th day of January, 1858, the said Hilzheim, to secure the payment of said note, executed to them, on the 15th day of April, 1857, a mortgage of his equitable interest in the undivided half of the land in controversy. This deed of mortgage was acknowledged on the 3d day of December, 1858, and filed for record on the 31st of December, 1858, and was recorded on the 5th day of January, 1859.

McLaughlin, in his answer, states that the contract for the work done by him on the hotel buildings was made in June, 1857, under which the work was commenced in July following, and finished in December, 1857, and this statement is sustained by the evidence. And that, at the time of the contract and doing the work, he had no notice or knowledge of Hyman Hilzheim's mortgages to the Greens of his equitable interest in the lots in controversy, nor had he at that time any notice or knowledge of the second mortgage made by Bowman to J. & T. Green, on the 25th November, 1857, to secure the payment of the note of $2,881.16, nor had he any actual notice of the first mortgage made by him to said Greens.

Upon this state of facts the question arises, which of these parties is entitled to prior satisfaction out of the property in litigation? In order to a correct determination of this question, it becomes necessary to

ascertain the rights of each of these parties under their respective liens upon the property in controversy.

McLaughlin's judgment was the result of a proceeding against Bowman and Hilzheim, in the circuit court of Hinds county, to enforce a mechanic's lien for work done in the year 1857, on hotel building on lots 1 and 2, fractional square 1 north, in the city of Jackson, under a contract made in June, 1857. His lien was given by the act of 1840, which provides that the mechanic or material man shall have a lien on the buildings and materials for the labor or materials furnished in the erection of the same; and that the said buildings and materials shall not be subject to any other lien whatever, until the said lien shall have been canceled according to the provisions of the act. Hutch. Code, 627, 628. Under this provision of the statute there can be no doubt that McLaughlin would have a paramount lien on the buildings and materials for his labor on them, and since the buildings have been destroyed by fire, he has a prior right to satisfaction out of the bricks and iron, and whatever may remain of them, by subjecting the bricks, iron and the remains of the buildings to execution on his judgment.

This question has been settled by the high court of errors and appeals in the case of Otley v. Haviland, where it was held, under this statute, that the lien of the mechanic for his labor and materials, furnished in the erection of a building under a contract with the proprietor of the land, is, as to the materials furnished and the building erected, superior to any prior lien on the land. The court say, in that case, that "where there are prior liens upon the land, at the time of the contract in relation to the building, the mechanic's lien as to the building is paramount to all prior liens upon the land, and his lien extends to the land when there is no subsisting prior lien upon it." 36 Miss. 19.

The first mortgage given by Bowman to the Greens,

on the 19th day of March, 1857, to secure the payment
of his note to them for $5,502.48, having been recorded
before McLaughlin's contract to do the work on the
hotel buildings, gives them a prior and superior lien on
the land on which the hotel buildings were erected.
But the second mortgage of Bowman of his interest in
the lots to the Greens, executed on the 25th day of
November, 1857, and the two mortgages of Hilzheim
of his interest in the land in dispute to the Greens,
must be postponed to the mechanic's lien of McLaugh-
lin upon the lots of land on which the hotel buildings
were erected, because he had no notice of them at the
time of his contract and commencement of his work.
For it has been determined that under this statute the
mechanic's lien commences from the time of making
the contract to do the work.    Bell and Passmore v.
Joseph Cooper, 26 Miss. 650.    One of Hilzheim's mort-
gages seems never to have been recorded at all, and
the other was not recorded at the time of the contract
and doing the work by McLaughlin, and the second
mortgage of Bowman was not made until after the con-
tract and during the progress of the work.    Mortgages
and deeds of trust shall take effect and be valid as to
all subsequent purchasers for valuable consideration
without notice, and as to all creditors from the time
when such deed of trust or mortgage shall have been
acknowledged, proved or certified, and delivered to the
clerk of the proper court to be recorded, and from that
time only.    Hutch. Code, 606.    The creditors, under
this statute, are such creditors as have a judgment or
lien.    Dixon v. Lacoste, 1 S. & M. 106; Picket v.
Banks, 11 ib. 451.

If judgment creditors have a prior lien to unrecorded
mortgages by virtue of their judgments, which are gen-
eral liens only on the property of their debtors, *a
fortiori* should a mechanic's lien, which is specific,
have a priority to such unrecorded instruments.

McLaughlin was a creditor of Bowman and Hilzheim of equal dignity with a judgment creditor at least, having a specific lien on the property in controversy, and has a prior right to satisfaction of his claim out of the real estate on which the hotel buildings were erected. When the property is sold his debt is to be paid out of the proceeds thereof before any part can be applied to the three last mentioned mortgages.

It has recently been held in Maryland, that in order to give a mortgage to secure advances a priority over a mechanic's lien, the mortgage must be recorded before the building is commenced; and that the commencement of a building under the mechanic's lien law is the first labor done on the ground which is made the foundation of the building, and is to form part of the work suitable and necessary for its construction. Brooks v. Lester, 36 Md.

We have thus arrived at the conclusion that McLaughlin, as a creditor of Bowman and Hilzheim, without notice, has a lien on the real estate and buildings superior to those of the Greens under the second mortgage of Bowman and the two mortgages of Hilzheim, as set out in the record, and is only postponed to the prior lien of the first mortgage, made, as aforesaid, by Bowman to the Greens, so far as regards the real estate in dispute, but with respect to the debris of the hotel buildings he is entitled to priority by virtue of his mechanic's lien over all other liens, and has a paramount right to subject the bricks, iron, and whatever remains of said buildings to the payment of his claim.

It is contended by the counsel for the appellant, that the first mortgage made by Bowman to the Greens, was satisfied by Bowman's cash deposits with the Greens, who, it is insisted, misapplied those deposits as a payment on a note held by them against Bowman for $14,420, dated 27th day of April, 1859. With respect to the appropriation of payments, there can be no doubt

that the debtor has a right to direct the application, and in case he fails to do so, the creditor has a right to make the appropriation to any valid and subsisting claim that is due which he may hold against his debtor. Such is the common law. The difference between the common law and Roman law is to be found in the application which the law makes in the appropriation of a payment in the absence of any made by either the debtor or the creditor. The common law appropriates the payment most beneficially for the creditor; the civil law appropriates the payment most beneficially for the debtor. Whatever difference of opinion may exist, with respect to the equity and justice of the rule respectively adopted by these systems of jurisprudence, it must be conceded, that the doctrine of the civil law upon this subject has been adopted in this state. 1 Domat, 906, § 2282; Poindexter v. La Roche, 7 S. & M. 699, 713; Hamer v. Kirkwood, 25 Miss. 99.

But, on the part of the appellant, it is contended that the note for $14,420, to which the payment was applied by the Greens, was without consideration, and made to hinder, delay and defraud Bowman's creditors, and, therefore, void as to his creditors. On the part of the appellees it is insisted that, even conceding that this note is void as to creditors, it is good and binding on Bowman, and that as M. Laughlin claims through him, he is equally bound by the note, and cannot impeach it. This would be a correct conclusion if the premises were true. But they are not so. The vice of the argument consists in the assumption that McLaughlin claims through Bowman, and is therefore estopped to deny that the note was without consideration, and made to defraud the creditors of Bowman. McLaughlin does not claim through Bowman, with respect to this note, but against him as his creditor, and as such has an undoubted right, as he would be injuriously affected by the debt if valid, to impeach

the note by showing a want of consideration, and that the transaction was fraudulent as against Bowman's creditors.

Joshua Green, in his testimony, asserts that the note was given for money loaned, and Bowman asserts, in his testimony, with equal positiveness, that the note is without consideration, and was made to defraud his New York creditors. Here is an issue which might have been properly submitted to a jury under section 1032 of the Revised Code of 1871, and which, under the circumstances, we think should have been submitted to a jury for their determination. And if, upon the trial of such issue, it should be found that the note was without consideration, and made to defraud Bowman's creditors, then there would be no appropriation by either party of the money of Bowman on deposit with the Greens, and the law would then make the appropriation of that money most beneficially for the debtor.

Is McLaughlin estopped by the judgment obtained by the Greens in the circuit court of Hinds county, against Bowman on his two first notes secured by mortgages as aforesaid, from showing that the money to the credit of Bowman in the hands of the Greens was improperly applied by them to the credit of the note for $14,420 ? We think he was not.

If Bowman was not permitted, on that trial, to impeach that note as fraudulent, it is difficult to perceive how McLaughlin, who is neither a party or privy to the judgment, can be precluded by it from showing that the large note, to which the deposits were applied, was made to hinder, delay and defraud Bowman's creditors, and being himself one of Bowman's creditors, and not involved in the web of fraud alleged to have been woven in this transaction, he as such creditor could not be affected by the result of that suit, and had an undoubted right, upon well settled principles of equity,

to show on the trial of this cause the true character of that transaction. The trial between the Greens and Bowman in the circuit court was *res inter alios acta*, and the judgment was not binding on McLaughlin.

It is a general principle, and one of the elements of the doctrine of *res judicata*, that personal judgments conclude only the parties to them and their privies. Parties, in the legal sense, are all persons having a right to control the proceedings, to make defense, to adduce and cross-examine witnesses, and to appeal from the decision, if an appeal lies. 1 Greenl. Ev. 573, § 535; Bigelow on Estoppel, 46. The term privity, denotes mutual or successive relationship to the same rights of property; and privies are distributed into several classes according to the manner of this relationship. Thus, there are privies in estate, as donor and donee; privies in blood, as heir and ancestor; privies in representation, as executor and testator, and privies in law, where the law without privity of blood or estate, casts the lands upon another, as by escheat. 1 Greenl. Ev. 216, § 189. It will thus be seen that McLaughlin was neither party nor privy to the proceedings in the circuit court between the Greens and Bowman, and therefore he is not estopped by the judgment from impeaching the note on the ground of fraud.

With reference to the tax title set up by the Greens to the lots in controversy, it may be observed that McLaughlin was proceeding to enforce his mechanic's lien on the lots and hotel buildings thereon, when he was restrained from so doing by injunction from the chancery court, at the suit of said Greens, who, during the pendency of said injunction, obtained a tax title to said lots of land, which is relied upon by them to defeat the claim of McLaughlin. Had it not been for the injunction procured by them, a sale would have taken place under McLaughlin's execution before the time

had arrived for selling the land for taxes, and then either McLaughlin or some other person would have become the owner, and McLaughlin would have obtained the benefit of his lien.    Having tied up the hands of McLaughlin by their injunction, it became the duty of the Greens to keep the property in that position and condition in which it would be amenable to the court when the final decree was rendered.    Had not the sale of the property been enjoined, McLaughlin would have been in the enjoyment of the fruits of his judgment before the sale for taxes, which would probably have been paid by the purchaser of the property under McLaughlin's execution.    We think the tax title acquired by the Greens during the pendency of the injunction, without any fault of McLaughlin, is such an unconscientious advantage as in equity and good conscience they ought not to retain.    Lord Eldon has said: "If there be a principle on which the courts of justice act without scruple, it is to relieve parties against that injustice occasioned by its own acts or oversight, at the instance of parties against whom the relief is sought."    The injunction in the case under consideration is the act of the court, procured at the instance of the Greens seeking the benefit of their legal advantage, against the injustice of which the court, acting upon the principle above announced by Lord Eldon, will relieve McLaughlin.    That eminent chancellor further said: "I consider persons asking an injunction as impliedly saying, they ask it upon the terms of putting the plaintiff in exactly the same situation as if they had not been entitled."    Pultney v. Warren, 6 Ves. 90.    This court has acted on this principle in the case of Marshall v. Minter, 43 Miss. 666, 678, in which they say: "Equity will remove the legal bar proceeding from lapse of time, as it would any other legal advantage unconscientiously obtained, or sought to be unconscientiously used."

The Greens having an interest in the land as mortgagees, acquired no additional interest or title by their tax deed, which in equity and justice must be regarded as intended to inure to the benefit of the parties interested. It has been decided that a purchaser at tax sale of land in which he has an interest as heir, acquires no additional title. Blackwell on Tax Titles, 400. The purchase of the land from the state by payment of the taxes thereon by the Greens was a protection of their interest as mortgagees, and they did not acquire thereby any additional title than that of mortgagees. The purchase, however, inuring to the benefit of both parties to this suit, the Greens are entitled to be repaid the amount they paid for the tax title, with interest out of the proceeds of the sale of said real estate, and should be perpetually enjoined from setting up said tax title to the prejudice of McLaughlin.

The only remaining question for our determination is that which impeaches the action of the court below, in refusing to permit the oral examination of Bowman in open court, on the ground that he was not an interested witness in the contemplation of section 1076 of the Revised Code of 1871. As a mortgagor of one undivided moiety, he had an equity of redemption as against the Greens, and had an interest in the residue of said real estate after the satisfaction of the mechanic's lien, and, therefore, after the affidavit of McLaughlin, that he had good reason to believe that an oral examination in open court was essential to the ends of justice and a full and fair development of the facts of the case, his oral examination should have been allowed in open court. The court erred in refusing such examination of Bowman.

For the reasons herein stated, the decree of the court must be reversed, and the cause remanded for further proceedings in the court below, in accordance with the principles of this opinion.