Boyd *v.* Allen.

## A. M. BOYD *et al. v.* THOMAS H. ALLEN.

MORTGAGE PRIORITY. *After acquired title by junior mortgagee.* B. had a prior and A. a junior mortgage upon a tract of land executed by S. A. afterwards bought the interest of S. and redeemed the land from the State which had purchased at tax sale. A. claimed to hold the land under the tax deed free from incumbrance of B.'s mortgage. *Held,* that by purchasing the title to the land acquired at tax sale, he could not thereby overreach the prior mortgage of B.

### FROM SHELBY.

Appeal from the Chancery Court at Memphis. W. W. McDOWELL, Ch.

C. F. VANCE and R. J. MORGAN for complainants.

WRIGHT & FOLKES for defendants.

COOKE, J., delivered the opinion of the court.

In 1856 complainant, A. M. Boyd, sold a plantation, known as the Donelson plantation, containing 1,577 acres, in Bolivar county, Mississippi, to A. J. Donelson. On February 16, 1867, A. J. Donelson executed a deed of trust upon said lands to one E. H. Martin, as trustee, to secure a balance of purchase money remaining due to A. M. Boyd of $25,955.71.

On September 20, 1871, said Martin, trustee, executed said trust, and sold said land to Martin Donelson, a son of A. J. Donelson, at the price of $15,000, which seems to have been the balance of the purchase money then remaining due, and Martin Donelson

6—VOL. 15.

executed his note to A. W. Boyd for this amount, together with the further sum of $2,000 loaned him by said Boyd, and which he secured by a deed of trust upon said plantation, executed the same day, to Alston Boyd, son of A. M. Boyd, as trustee. On January 3, 1873, Martin Donelson sold said lands to J. W. Farrell, J. M. Farrell, W. T. Simpson and M. .E. Simpson, at the price of $25,000—$10,000 of the purchase money being paid · down, and for the residue executed their three several promissory notes to said Martin Donelson for $5,000 each, payable respectively upon the first day of January, 1874, 1875 and 1876, and which they secured by a deed of trust upon said lands executed to Alston Boyd as trustee, which included all the stock, farming implements, and upon the plantation, and which was assigned by Martin Donelson to A. M. Boyd as collateral security for the purchase money notes due him from said Donelson. Said Farrells and Simpsons went into the possession of said plantation, and cultivated the same until about March 22, 1875, up to which time complainant's, A. M. Boyd's debt, had been reduced to about the sum of $11,799.55, and said Simpsons and Farrells had become indebted to respondent, Allen, in the sum of $3,996.41, and for which he had no security. In the meantime the Simpsons and Farrells had disagreed to such an extent that they could no longer operate upon said plantation together, and at this juncture an arrangement was effected by which the Simpsons were to assume the indebtedness to Allen, as well as the purchase of the plantation and payment of the unpaid

purchase money due complainant, A. M. Boyd and the Farrells to be let out entirely. At this time two of the three $5,000 notes executed by them for the purchase money of the lands were past due, and an arrangement was made with A. M. Boyd, by which he was to extend the time of credit upon the amount of purchase money due him by taking the notes of the two Simpsons, payable in annual instalments, of one, two, three, four and five years, and to reduce the rate of interest from ten per cent., which Donelson was paying him, to eight per cent. per annum. In accordance with this arrangement five notes were executed by M. E. and W. F. Simpson to A. M. Boyd, each for $2,359.91, dated March 22, 1875, payable respectively upon January 1, 1876, 1877, 1878, 1879 and 1880, each bearing interest at the rate of eight per cent. per annum. To secure these notes, M. E. and W. F. Simpson executed a deed of trust to Alston Boyd as trustee upon said lands, and the same personal property embraced in the trust deed executed by them and the Farrells on January 3, 1873, as above stated, and Alston Boyd released said last mentioned deed of trust by executing to them a quitclaim. An arrangement was also made with respondent, Thomas H. Allen, by which he took the note of said Simpsons for the indebtedness of said Farrells and Simpsons to him for $3,996.41, and to secure which, and a further indebtedness of not more than $8,000, which said Allen had agreed to advance to them with which to run the plantation, said Simpsons executed another or second deed of trust to one Brown, as

trustee, upon the same plantation, stock, farming im-plements, etc., embraced in said deed of trust to Boyd, and such additional stock, etc., as they had acquired since the execution of their first deed of trust in 1873, and also upon all the crops of every descrip-tion to be raised upon the plantation that year. This deed of trust was dated March 23, 1875. These last mentioned two deeds of trust were registered in the order in which they were executed, that for the ben-efit of complainant, A. M. Boyd, which was dated March 22, 1875, having been registered some days before the one for the benefit of Allen.

On March 12, 1878, respondent, Allen, purchased the interest of the Simpsons in said plantation of one of the Simpsons, the other one having become insane, who executed a deed to him of that date therefor, and surrendered the possession of the same to him, and left the country, being entirely insolvent, and on the same day said Allen *redeemed* said lands from the State of Mississippi, the Simpsons having permitted the same to be sold for the taxes due thereon for the year 1876, and allowed the time for redemption to expire, and a deed for said land was executed to said Allen therefor by the Auditor of Public Accounts for the State of Mississippi, which is also dated March 12, 1878, but which respondent, Allen, shows by his testimony was not delivered to him until some days after its execution.

Allen being in possession of said lands, set up claim to hold them, by virtue of said tax title, ad-versely and in hostility to the prior deed of trust of

A. M. Boyd, and the parties all being residents of Tennessee, this bill was filed to enjoin the respondent, Allen, from setting up or relying upon said tax deed as against the deed of trust of complainant, to compel him to execute a quit-claim as against said deed of trust, and to have said tax deed declared invalid upon various grounds alleged.

The bill alleges in substance that the arrangements by which the Farrells were released from the indebtedness of themselves and the Simpsons to A. M. Boyd, and to Allen, and the two deeds of trust to secure Boyd and Allen respectively, executed by the Simpsons as above stated, were in reality one transaction, which was brought about and procured by Allen as a means of securing his debt, and that he promised and undertook to see that the taxes upon the plantation were kept paid up, and for that reason the complainants did not look after that matter, and that the procurement of the tax deed by respondent, Allen, in the manner he did, and his failure to see that the taxes were paid was a fraud on his part upon the rights of complainants. Answer upon oath was expressly waived, and the respondent denied very positively all the material allegations of the bill.

The chancellor granted the relief sought, and the Referees have reported that his decree should be affirmed. The exceptions open the whole case.

The trustee, Alston Boyd, who attended to the matter as agent for his father, A. M. Boyd, testifies positively that respondent, Allen, did agree to see that the taxes were kept paid up, and that he subsequently,

Boyd *v.* Allen.

upon different occasions, told him that he was looking after the taxes on the plantation, and having them paid. The respondent as positively denies these statements. There is no other direct testimony upon this question. The circumstances, we think, tend strongly to support the testimony of the witness, Boyd. At the time of these transactions, as we have seen, complainant's, A. M. Boyd's, debt, amounted to $11,799.45, which was bearing ten per cent. interest, and amply secured upon a plantation which had twice been sold for as much as $25,000, and which we may fairly presume was worth about that sum, beside a considerable amount of personal property. Allen's debt amounted to $8,996.41, for which he had no security. It is shown by the record that the respondent, Allen, either prepared the firm notes that were executed to Boyd in lieu of the original notes, or had it done, and procured the signature of the Simpsons to them, and for this purpose obtained possession of the original notes from Boyd, and executed his receipt for them, which is exhibited in the record; and Allen, in his testimony, denies that he knew any thing about this receipt, or that it was executed at his place of business, but upon his attention being called to the fact that it was written on paper that contained the letter head of his firm, admitted that it was written at his counting-rooms, and is in the hand-writing of his clerk. By procuring for the Simpsons extended credit, upon smaller annual payments and a reduced rate of interest, would better enable them to pay off this indebtedness by the production of successive crops,

as well as his own unsecured debt of near $4,000; besides he was procuring by the arrangement a second mortgage upon property which appeared to be, and, we think, was not only ample security for the debt of Boyd, for which it was first liable, but also for his unsecured debt of $4,000, as well as the $8,000 he undertook to advance to them.    The Simpsons had also permitted the lands to be sold for the taxes of 1874 and 1875, and purchased by the State, and respondent, Allen, did, in September, 1876, furnish them the money, amounting to over $1,000, with which to redeem it.    He, in his answer, states that it was a very common practice for tax-payers to permit their lands to be sold for taxes, and bought in by the State, and held for a considerable time, as by this means they avoided the payment of these taxes as they became due, and could make easy terms with the State for the redemption of their land.    He had advanced to the Simpsons money with which to pay off one of their notes to complainant, or had paid it for them, and on the same day upon which he took the deed of Simpson for the land, and procured the execution of the tax deed to himself, he also paid the second one of said notes to complainant, and which reduced his debt against the Simpsons, secured by his trust deed, to about $7,000, besides interest.    As Allen had embraced in his deed of trust all crops of all descriptions to be raised upon the lands, he admits that the Simpsons had no means with which they could pay the taxes except as advanced by him under his agreement to advance them, not exceeding $8,000.

The consideration expressed in the face of the deed from Simpson to respondent, Allen, is $4,000 in cash, and the payment on that day to complainant, A. M. Boyd, the second note of $2,359.91, and eight per cent. interest thereon from March 21, 1879. Allen admits that he paid no money to Simpson, but says the actual consideration was the Simpsons' indebtedness to him at that time, together with the amount then paid by him to Boyd, due upon this second note, and which altogether amounted to about $6,000, which was about $2,000 less than the amount he had agreed to advance them. Nor is it shown that he ever did advance them any greater amount. The amount of taxes for 1866, for which the lands were sold was about $500. The entire amount due to complainant and respondent at the time of this transaction was about $13,000, secured on a plantation worth, as we have seen, about $25,000. At the time respondent paid said second note of the Simpsons to complainant, Boyd, and which, as we have seen, was the same day he took Simpson's deed, and procured the execution of the tax deed to the land, he neither informed Boyd of these transactions, nor gave him any intimation that the taxes had not been paid, nor did he ever register Simpson's deed to him, nor did he give any notice that he was not going to continue to advance the money to pay the remaining notes as they fell due. Nor was it until the third note became due, and he was called on to pay it as he had done the others, that he revealed the fact to complainant that he had purchased the Simpsons' interest

in the land, and had procured said tax deed to said land, and upon which he intended to rely to over-reach complainant's deed of trust. It was alike to the interest of respondent, as well as complainant, that these taxes should be paid. He had by the arrangements that were entered into obtained security for a large debt for which he had none before, and no chance of any. There was no means by which the owners of the lands could pay the taxes except as he advanced them under his agreement. His actual advancement of over $1,000 for that purpose, all goes to corroborate the testimony of Boyd, and satisfy us that it was understood that the taxes on the plantation were to be kept paid up out of the moneys, not exceeding $8,000, which respondent, Allen, was to advance. When he purchased Simpson's interest he had secured not only his debt, but this valuable plantation, subject to complainant's lien of about $7,000, besides some interest. It was his interest that these outstanding taxes which had been bid upon the land by the State of Mississippi should be paid off, which he did, and having the land secured, at any rate subject to the incumbrance of complainant's deed of trust, he had nothing to lose by the experiment of attempting to get rid of it by setting up this tax deed.

But if there had been no such understanding or agreement in relation to the payment of taxes, the respondent as mortgagee, and especially as purchaser from Simpson, could not, we think, by the redemption of the lands from the State, and taking this tax

deed, acquire any better title than he already had, or
be permitted to set it up in hostility to the title of
his mortgagor, or vendor, Simpson.   " The tax is
upon every possible interest in the land, and all par-
ties having interests are equally under obligation to
the State to make payment": Cooley on Taxation,
351.   " While a mortgagor in general cannot be al-
lowed to cut off his mortgagee by buying in the land
at a tax sale," says Judge Cooley, " yet if the mort-
gagee were in possession, receiving the issues and profits,
and bound to pay the taxes himself, it might not be
*so clear* that the mortgagor should be precluded from
taking advantage of the mortgagee's neglect.   If it
were to be so held, there would seem to be reason
for holding that the mortgagee, by reason of his rela-
tion to the title, was precluded from becoming purchaser
of the mortgagor's interest at a tax sale, and that
his remedy would be confined to a payment for the
protection of his lien, with a remedy over for the
amount paid.   It cannot be said in such a case that
either mortgagor or mortgagee is under no obligation
to the government to pay the tax.   On the contrary,
the tax being one that purposely is made to override
the lien of the one as well as the title of the other,
it might well, as it seems to us, be held that neither
mortgagor nor mortgagee was at liberty to neglect
the payment, as one step in bettering his condition at
the expense of the other, but that the presumption
of law should be, that the party purchasing did so
for the protection of his own interest merely ": Cooley
Tax., 347–8.

Boyd *v.* Allen.

This precise question has not been decided by the Supreme Court of Mississippi, so far as appears by the cases to which we have been referred, and to which we have had access. It was discussed, and the conflict of authorities upon the question referred to in the case of *Martin* v. *Swafford,* 59 Miss., 331, but the case was decided upon other grounds. It was, however, held in that State that a mortgagee could not, by purchasing the title to the land at a tax sale, overreach a mechanic's lien, which was superior to that of his mortgage: *McLaughlin* v. *Green,* 48 Miss., 175. Also, that one tenant-in-common would not be permitted to rely upon a tax title purchased in by him as against the title or right of his co-tenant: *Allen* v. *Bole,* 54 Miss., 334. We think the principle involved here is clearly recognized in the above, and other cases to which we have been referred of similar import, but which need not be cited. But if the question was conceded to be an open one in Mississippi, as is contended for the respondent, while we are aware that the authorities are conflicting, we think this view of the question is supported by the better reason.

Chancellor Cooper, upon a review of the principal authorities, decided that a mortgagee of realty, even if the conveyance contain provisions which render it void as to other creditors of the grantor, cannot, by purchasing the property at a tax sale, acquire any title inconsistent with that held under his deed: 3 Tenn. Ch., 40; and also, that one who occupies such a fiduciary relation as to make it his duty to pay

the taxes, can acquire no additional title by purchasing at a tax sale: 1 Tenn. Ch., 625.

While the deed executed to Allen by Simpson, and the tax deed in question procured by him from the Auditor of Public Accounts of Mississippi, bear the same date, as we have seen, Allen shows by his testimony that the tax deed was not delivered to him until some days after its execution. He also states that Simpson, upon the execution of his deed, delivered him the possession of the lands in question. It is, therefore, apparent that he took possession under Simpson's deed, and was a purchaser from him before he obtained the tax deed. By the laws of Mississippi, a deed does not take effect until its delivery: *McGhee* v. *White,* 2 Simp., 41. It is, therefore, fair to assume that Allen went into possession of the lands under his purchase from Simpson, and could not occupy any better position. "If there be an incumbrance upon a vendor's title, or an adversary title, and it be extinguished by the vendee, it will inure to the benefit of the vendor, who will be bound to make an abatement in the purchase money equal to what it cost to clear the title. This is the result of the relation": *Meadows* v. *Hopkins,* Meigs, 181. This (and the preceding cases in conformity with it) has been uniformly followed in Tennessee, and this case was cited and approved by the Supreme Court of Mississippi in the case of *Hardeman et als.* v. *Cowan,* 10 Smedes & Marshall, 486. In the view we have taken it is unnecessary to determine as to the validity of the tax deeds, and as that question depends exclu-

sively upon the laws of Mississippi, and could be of no general interest here, we have not deemed it necessary to investigate or decide it.

The result is, the report of the Referees is approved, and the decree of the chancellor will be affirmed with costs.